UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GRAND HERITAGE HOTEL GROUP, LLC, Plaintiff, :
v. : C.A. No. 04-528T
VICTOR H. MILLS, Defendant. :

**DECLARATION OF MICHAEL J. MASON**

I, Michael J. Mason declare under penalty of perjury hereby state and declare as follows:

1. I am the Vice President – People of Grand Heritage Hotel Group ("Grand Heritage").

2. I was personally involved in the recruitment of Victor Mills to be Vice President of Operations-East Coast for Grand Heritage. In this capacity, Mr. Mills was to serve as the General Manager of the Providence Biltmore Hotel.

3. I, along with other Grand Heritage executives interviewed Mr. Mills. Mr. Mills told us that he left Peabody Hotel Group because he was recruited away from Peabody to work at a hotel in California for Sunstone.

4. An executive recruiter conducted background checks for us on Mr. Mills. The recruiter's interview notes are attached hereto as Exhibit 1.

5. During the interview process with Mr. Mills, we inquired as to his background and his prior work experiences, as well as his employment record. As a human resources professional, I focused on Mr. Mills' employee relations background.

6. At no time during the interview process did Mr. Mills inform us that he had received warnings and reprimands from Peabody Hotel Group regarding his discriminatory treatment towards female employees and female hotel vendors. We have since learned that a Peabody employee did in fact file an EEOC charge against Mr. Mills for sexual harassment. A Peabody vendor threatened to file for a restraining order against Mr. Mills for sexual harassment. Mr. Mills record with Peabody shows a pattern of harassing behavior toward female employees and warnings, as well as counseling against engaging in harassing behavior in the workplace.

7. If we had known of Mr. Mills' prior record with Peabody and, specifically, his employee relations record, there is no way we would have even considered him for employment, let alone hired him into such a position.

8. As Vice President Operations-East Coast, we envisioned Mills focusing initially on the Biltmore Hotel, and then branching out for new property acquisitions and East Coast operations. He would be based in Providence, Rhode Island. Grand Heritage currently operates 3 hotels in Rhode Island.

9. Based on Mr. Mills interviews and background information, we made him an employment offer, on or about June 23, 2004 which is attached hereto as Exhibit 2. We paid for his relocation from California to Providence, Rhode Island and paid a recruiting fee for his placement.

10. Mr. Mills accepted our offer on June 24, 2004 and commenced work at the Biltmore shortly thereafter.

11. Under Mr. Mills' offer of employment, he was allowed to stay in the Biltmore Hotel on a temporary basis not to exceed 3 months in order to find housing in the Providence area. He ended up overstaying his welcome at the Biltmore. He did not move out of the Biltmore until his termination in December, 2004. I never told Victor not to worry about moving out of the Hotel;

in fact, I told him that he needed to work on living arrangements outside the Hotel. Employees do not usually stay in the hotels beyond the temporary periods set forth in their agreements.

12. Almost from the start of Mr. Mills employment, we encountered problems with his performance and management of the Hotel.

13. As early as September, 2004, I sent Mr. Mills a coaching and counseling memorandum which is attached hereto as Exhibit 2. I constantly talked with Victor about his management style and the concerns we had with his style both prior to and after this memorandum.

14. John Cullen, the President of Grand Heritage told me that he had serious concerns with Mr. Mills' performance and management skills beginning as early as September, 2004. Mr. Cullen sent Mr. Mills emails about his performance as early as September 23, 2004. I also met with Mr. Mills on one occasion. I never told Victor not to worry about these concerns. To the contrary, I told him the concerns over his performance and management style were serious.

15. John Cullen and I met with Mills in Providence to discuss issues we were having with his management style and management of the Hotel. When we hired Victor we envisioned him also overseeing Vanderbilt Hall and other East Coast properties. Because of the concerns we had at the Biltmore, we didn't give him those responsibilities.

16. At the commencement of his employment, Mr. Mills signed our employment policies, including our policy prohibiting sexual harassment in the workplace. Mr. Mills also signed the Hotel's grooming policy. By signing off on these policies, Mills agreed to follow these policies. Exh. 3 attached hereto. In fact, as the General Manager of The Biltmore, employees and managers looked to him to set an example. Mr. Mills' offer letter stated that he is "expected to follow the Employee Manual and Company's policies and procedures." Grand Heritage is a successor to Chesapeake Hotel Group, and the policies of Chesapeake apply to

Grand Heritage, as the policies had not been re-printed at the time. The Chesapeake policies applied at the time of Victor's employment.

17. During the Fall of 2004, we continued to have concerns regarding Mr. Mills' performance.

18. We also started receiving complaints from employees that Mills was spending time away from the Hotel when he should have been at the Hotel, running the Hotel. Mills missed morning management meetings which he was supposed to attend and lead. During many of these meetings, he was on his long bicycle rides, and many times showed up in his office in his tight Spandex bicycle shorts. This was in violation of Hotel policy.

19. In early December 2004, our Human Resources Manager at the Hotel, Lauren Nyzio, received a sexual harassment complaint from an employee Autumn Neugent. The complaint accused Mills of creating a hostile work environment. The complaint is attached hereto as Exh. 4.

20. Upon hearing this I flew immediately to Providence to conduct an investigation into this allegation.

21. On December 6, 2004, I conducted an investigation by interviewing the employee who initiated the harassment complaint, as well as other members of Hotel management. Mr. Mills was advised that an investigation was underway and that he was not to engage in retaliation against any employee for exercising their rights pursuant to our policies.

22. I first interviewed Victor Terry, the Hotel's head of security. Mr. Terry stated that he had problems with Mills' management of the Hotel. In particular, he stated that Mills was gone from the Hotel for long periods of time, he walked around the Hotel in his tight bicycle shorts – even greeting Hotel and wedding parties in his bicycle shorts. Mr. Terry stated that the majority of the Hotel thought Victor was a "freak" and they nicknamed him "country club Victor

[Mills]." Mr. Terry stated that Mills missed many of the 9:00 a.m. management meetings, instead opting to ride his bike. According to Mr. Terry, the overnight security guard called Mills "bicycle boy." Mr. Terry informed me that on two occasions, Lauren Nyzio, the Hotel's human resource manager complained to him in conference about inappropriate behavior and comments of a sexual nature by Mills toward her.

23. I next interviewed Lauren Nyzio, who is the Hotel's human resources manager. She had an office adjacent to Mills. Ms. Nyzio was a new human resources manager who was promoted from an administrative assistant job. She first told me that in front of two Hotel employees, Victor Mills told her that he would "spank her." These two employees (Felix and Jeff) later told Nyzio that they couldn't believe Mills said that – especially to a human resources manager. It gave the employees the impression that Mills didn't care about the Hotel's policies or human resources for that matter. Nyzio further stated that Victor was overly "touchy feely" with her and he would grope her in front of other employees. Two Hotel employees (Brenda and Lynn) commented to Lauren that they "couldn't believe Mills did that to her." An employee named Erin complained to Lauren that Victor kissed Erin on the head. Lauren also said Mills made inappropriate comments about the Hotel's owner. One time when a hotel guest called Mills to complain about his room, Mills put the caller on mute and told Nyzio that the guest "must be having oral sex in the shower."

24. Nyzio stated that she received a complaint from Autumn Neugent that Mills had created a sexually hostile work environment. Nyzio told her to put her complaint in writing, which she did. Nyzio also wrote a memo outlining some of the concerns she had with Mills.

25. When Mills started to believe that his behavior may be an issue, Nyzio believes he retaliated against her. First, he went onto her computer and checked her e-mails. Lauren informed me that after I had called Mills to tell him his job may be in danger he grabbed

Lauren's arm and stated "I need to talk with you." Attached hereto as Exh. 5 is a letter to me from Lauren Nyzio dated December 13, 2004, outlining some of Mills' retaliatory actions.

26. Nyzio also stated that Mills openly disregarded Hotel policies. For example, he dressed casually when hotel policy was suits and ties for men at all times when in the Hotel. Lauren also told me that Victor criticizes out loud the weight of some of our female work staff. He makes no such criticisms of men.

27. I next interviewed Erin, who is a sales assistant. Erin told me that Mills placed his arm around her which made her feel uncomfortable. Sometime in the Fall of 2004, Mills kissed Erin on the back of the head. This occurred in the workplace and Erin told me that it was unwelcome. Erin also told me that she heard Mills tell female employees that "they look good." He said this about Connie and Stephanie. They did not feel that the statements were appropriate or welcome. Erin stated that she would not feel comfortable in the office alone with Mills. Erin also heard and witnessed Mills making sexually inappropriate comments to Lauren.

28. I then interviewed Autumn Neugent, who made a written complaint of a hostile work environment against Mr. Mills. She stated that since August, 2004, Mr. Mills was "free" with his hands and mouth. She said that she observed Mr. Mills during work hours pay a lot of attention to the female employees in sales; he kissed them on their heads which made her (and other female employees) feel uncomfortable. Autumn also witnessed Mr. Mills kiss an employee named Connie, she thought they were in a relationship or married. Autumn also told me that she observed Mr. Mills rubbing other female employees arms and it made her and other female employees feel "creepy." In meetings, Mr. Mills made comments to Autumn and other female staff about their eating habits and their weight. The occurrence which led Autumn to write a complaint was that she observed Mills on three occasions exclaim "wow" when

Stephanie walked past him and he looked at her in a sexual way. This made Autumn feel uncomfortable. In a word, Autumn described Mills as a "pig."

29. I next talked to Brenda from accounting. Brenda told me that she observed Mills putting his arms around Lauren on numerous occasions and even in her office. Brenda said that Lauren later complained to her noting "he does it all the time." Brenda stated that Mills also makes comments regarding female employees weight. Brenda observed Mills hug and kiss Erin. At an off property bar, Blake's, Brenda observed Mills "moving closer to Erin" and heard Mills comment "I wish I weren't married." Brenda also stated that the bookkeeper from McCormick & Schmicks, Tessa stated to her that Mills made her feel "uncomfortable."

30. I next interviewed Tessa Green, the bookkeeper from McCormick & Schmicks, the restaurant located in the Biltmore Hotel. She stated that Mills is "touchy and feely" with her (i.e., patting her the back), and she has told him not to do that. She said that a former server from McCormick's complained about Mills' unprofessional behavior. Tessa stated that she has observed Mills in the Hotel Starbucks in Speedos and Spandex bike shorts.

31. I next interviewed Stephanie from sales. Stephanie told me that Mills makes comments and does things that can be construed as harassment, such as comments on how females look. Stephanie stated that another employee told her that Mills makes her uncomfortable in the office.

32. I next interviewed Connie, a hotel sales employee. She informed me that she has experienced unwanted physical touching from Mills. He has kissed her and put his arms around her in the office. These were unwanted and unwelcome advances. He grabbed her from behind. Connie stated that she wouldn't feel comfortable with Mills alone. She stated that she, as well as the staff, have no respect for Mills. Stephanie stated that Mills bought a gift for an employee named Kerri, and he was always "hitting on her."

33. I next interviewed Scott, the Director of Catering for Restaurant Associates – the Biltmore's on-site catering contractor. Scott stated that during Mills' first few weeks on property, Lauren Nyzio came to him in confidence complaining about Mills' behavior toward her and how to handle it. He observed Mills acting inappropriately toward Lauren, including inappropriate comments and staring down her shirt. Scott also told me that he observed Mills putting his hand around Kerri Quinn Jaffy. Scott asked Kerri if he could do anything, her response was "I can take care of myself." Scott told her to discuss this with George Stark, the Hotel's former human resources manager.

34. I then interviewed Pat Coleman, the Hotel's Chief Engineer. Mr. Coleman informed me that a gentleman named Rick from Berman Construction, a contractor working at the Hotel, informed him that he had observed Mills talking inappropriately toward hotel guests. The comment he could recall Mills saying was that the guest "was not bad for an old woman," referring to her body. Coleman said that he observed Mills in the hotel guest elevator talking to a hotel guest in his Spandex shorts. Coleman told me he observed Mills looking at Lauren Nyzio inappropriately. Coleman observed Mills on the third floor of the Hotel taking a tray of beers to his room.

35. After these interviews, I came to the conclusion that Mr. Mills had created a hostile work environment, in violation of our policies and in violation of his agreement with us to abide by Hotel policies. The criticisms of Mills were consistent and I felt there was no reason to interview him. If this had been a case of "he said, she said" I would have felt differently about getting his side of the story. However, it was so consistent that he had created a hostile work environment that I saw no benefit in him refuting virtually every manager in the Hotel.

36. It became clear to me that Mills could not remain on the job as he had already clearly created a hostile work environment and had lost all credibility with this management staff. As such, he had lost the ability to do his job.

37. I along with John Cullen the President of Grand Heritage made the decision to terminate Mills' employment immediately for cause, and in accordance with our agreement with him. Keeping him on the property could expose us to continued liability.

38. After we terminated Mr. Mills we received a letter from his attorney threatening to sue us for wrongfully terminating his employment in violation of his agreement. We felt so strongly about Mr. Mills' behavior at the Hotel and that he had taken advantage of us that we decided to sue him instead.

39. During the course of this lawsuit, and as previously stated in this Declaration, we learned that Mills had similar problems at Peabody Hotel Group. I find his behavior even more reprehensible in our case because he received warnings from Peabody and should have been on notice of appropriate workplace behavior. Because he wasn't truthful and forthcoming with us during the interview process we consider his contract null and void – even putting aside we had the right to terminate him for cause, without notice.

I hereby certify under penalty of perjury that the foregoing is true and correct, executed on this 16 day of November, 2005.

Michael J. Mason