**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

GRAND HERITAGE HOTEL GROUP, LLC
Plaintiff,

Vs. C. A. NO.: 04-528T

VICTOR H. MILLS
Defendant.

**DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Now comes the Defendant and hereby requests that this Court deny Plaintiff's Motion for Summary Judgment for the reasons set forth in the supporting Memorandum, Response to Statement of Undisputed Facts and Declaration of Victor Mills. In summary, Defendant states that whether the parties breached their contractual obligations to one another is necessarily a question of fact to be determined by the jury. Moreover the facts relied upon by the Plaintiff are seriously in dispute.

Moreover, if this Court is not satisfied of the there are material facts in dispute, Defendant urges this Court to deny judgment at this juncture pursuant to Rule 56 (f). Plaintiff relies on the declaration of Michael Mason, Autumn Neugent and other Grand Heritage employees in support of its motion. Defendant contends that the depositions of six Grand Heritage employees are scheduled within the coming weeks. These include the depositions of two top Grand Heritage executives and a 30(b)(6) deposition of the corporate entity.

Defendant,
VICTOR H. MILLS,

Melody A. Alger, Esquire #4585
Baluch, Gianfrancesco, Mathieu & Alger
155 South Main Street, Suite 101
Providence, RI 02903
Phone: 401-331-1434
Fax: 401-351-9653

**CERTIFICATION**

The undersigned hereby certifies that a copy of the within was mailed, postage pre-paid to:

Andrew B. Prescott, Esquire
Stacie Boeniger Collier
NIXON PEABODY LLP
One Citizens Plaza, 5th Floor
Providence, RI 02903 on this 31st day of ~~April~~ March 2006

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

GRAND HERITAGE HOTEL GROUP, LLC
Plaintiff,

Vs. C. A. NO.: 04-528T

VICTOR H. MILLS
Defendant.

## DEFENDANT'S MEMORANDUM IN SUPPORT OF OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. FACTUAL BACKGROUND[1]

In June of 2004, Defendant Mills accepted the position of Vice President, Operations-East with the Plaintiff corporation. Additionally, Mills was to serve as the General Manager of the Biltmore Hotel in Providence. Grand Heritage, through its authorized representatives, verbally offered Mills a base salary of $150,000.00, a guaranteed bonus earned and paid quarterly, and an equity position which was represented to be worth an estimated two to three million dollars within five (5) years. The offer included relocation expenses, temporary housing and expenses at the Biltmore Hotel and other insurance and benefits.

Prior to relocating, Mills received a document that purported to reflect the terms of the employment agreement. There are a number of components of the offer which were not included. Several changes were made and initialed and both parties executed the agreement. Mills inquired as to why details of the "Phantom Equity Plan" which had been

[1] Defendant's statement of facts is gleaned from both his counterclaim and the declaration of the Defendant, submitted herewith. Defendant notes that the declaration appended is a faxed copy, the original being en route to Rhode Island. Defendant notes that a faxed copy was necessary as the within motion was served during defense counsel's period of court excusal and, since her return, Defendant had to be located in Florida on a business trip.

offered to him were not outlined in the employment agreement. He was advised that Grand Heritage was in the process of drafting the language on the plan, which was represented to be available to several Grand Heritage executives.

Based upon the verbal representations of Grand Heritage and the employment agreement, Mills relocated to Rhode Island on or about June 28, 2004, thereafter selling his home in California.

Despite numerous requests and assurances by Grand Heritage's Vice President-People, Mills never received documentation of the Phantom Equity Plan as promised. Mills, as well as other executives and/or principals of Grand Heritage and/o the Biltmore, resided at the Biltmore Hotel for at least some of the time Mills temporarily resided there.

Mills, as with other executives, was allowed to bill meals and other incidentals to expense reports. These expenses were submitted and approved by Grand Heritage on a monthly basis. During the course of his employment, Mills was regularly in contact with Grand Heritage executives, including one Grand Heritage principal who was a temporary resident of the Biltmore Hotel for most of Mills' tenure as manager.

Because his residency at the Biltmore was intended to be temporary, Mills made plans to purchase a home in the area. Mr. Mills advised Grand Heritage, through its agents, employees and executives, of his plans to purchase a residence in Rhode Island. In or about November of 2004, Mills found a suitable home in Barrington, Rhode Island and agreed to purchase same. In accordance with the real estate purchase and sales agreement, Mills tendered a deposit of $40,000.00 on the residence.

On or about December 1, 2004, Mills was contacted by Michael Mason, Grand Heritage's Vice President-People regarding certain management issues. During this

conversation, Mr. Mason discouraged Mr. Mills from closing on the purchase of his home and suggested that he instead "rent". Mr. Mason was advised that Mills was scheduled to close on the property within ten (10) days and that Mills liable for losses to the seller for Mills' failure to do so. Mr. Mason advised that he would meet with Mills on or about December 6, 2004.

On December 6, 2004, Victor Mills was advised that Grand Heritage had received a complaint of misconduct and that Mills would be suspended with pay in order for Grand Heritage to conduct an investigation. Several hours later, Mills was asked to appear at the office of Grand Heritage's legal counsel. Mills was forbidden from having his counsel present. At the meeting, Grand Heritage terminated Mills for alleged "misconduct", without advising Mills the nature of the conduct alleged, the subject of the purported complaint, or the information that the "investigation" was alleged to have yielded. At approximately 4:00 p.m. on December 6, 2004, Mills was told that he and his wife would have until noon on December 7, 2004 to vacate the Biltmore premises.

Mills was subsequently served with the within "Complaint for Declaratory Judgment and for Breach of Covenant of Good Faith and Fair Dealing." In the Complaint, it was alleged that Grand Heritage received a written allegation of sexual harassment on or about December 3, 2004. It was alleged that the "investigation" conducted in the wake of the allegation revealed that Mills was referred to by staff as "country club Victor", that all interviewed indicated that they had "no respect for" Mr. Mills, and that Mills' sundry offenses included being spied in the Biltmore (where he resided) wearing a "spandex bike outfit." Not surprisingly, Mr. Mills was never interviewed during this hasty investigation.

It should be noted that Grand Heritage terminated Mr. Mills' employment on December 6, 2004. The following morning, Mr. Mills vacated the premises and moved to Memphis, Tennessee. One week later, Grand Heritage filed the within lawsuit against Mills, ostensibly seeking a declaration that it did not breach Mills' employment contract, and advancing a theory that Mills was required to reimburse his relocation and even recruiting expenses, under a specious claim of breach of covenant of good faith and fair dealing. Defendant counterclaimed for breach of contract, breach of covenant of good faith and fair dealing, fraudulent misrepresentation, abuse of process and unlawful termination.

## II. SUMMARY JUDGMENT IS NOT APPROPRIATE HERE

### A. GRAND HERITAGE BREACHED ITS CONTRACT WITH MILLS

In essence, Plaintiff admits that there was a contract of employment between the parties and that the parties owed a duty of good faith and fair dealing to one another. Under the terms of the employment contract, Mills' employment could be terminated at any time, and without notice, for "cause." The contract defines "cause" as follows:

> (a) the continued failure (including incapacity to perform your duties) by you to perform your duties; (b) failure to meet goals and targets as specified by the company; (c) any act of fraud, misappropriation, dishonesty, embezzlement or similar conduct against the company, including its hotels; (d) commission of a felony or a misdemeanor; (e) illegal drug use; or (f) voluntary or involuntary disillusion of the company.

Plaintiff's Memorandum, Tab B. Plaintiff contends that it terminated Defendant "for cause" as a result of his "continued failure ....to perform [his duties]." Grand Heritage does not contend that Defendant was fired under subsection b, or "the failure to meet goals and targets as specified by the company."

Plaintiff makes the specious claim that Defendant was terminated after an investigation into a complaint received from a Biltmore employee on December 3, 2004 (Plaintiff's Complaint at p.3). The complaint alleged that one employee heard Mills say the word "wow" after another employee had walked down the hall and that she saw Mr. Mills looking at the other employee later in the day. Mr. Mills has denied that he was looking at his employees in an inappropriately way, or that he directed the "wow" comment to any particular employee, or in any inappropriate manner. Nonetheless, supposedly on the basis of this bizarre complaint, Plaintiff's Vice-President of People, Mike Mason, came from Portland to Providence allegedly to "investigate" this claim. Mills claims that the "investigation" was a sham and that employees were falsely advised that Mr. Mills had been accused of sexual harassment, that he was being terminated, and to relate any sundry criticisms they may have of Mr. Mills.[2] Mills denies Plaintiff's factual allegations and relies upon the supporting Declaration attached hereto as Exhibit A.

Mills on the other hand claims that the firing was pretextual and that Grand Heritage never intended to honor his contract. Michael Mason was in constant communication with Lauren Nyzio, Mills' executive assistant, early on during Mills' tenure, encouraging her to report to him behind Mills' back despite that she was supposed to report directly to Mills. See Nyzio deposition, p. 74, attached hereto as exhibit B. They undermined Mills constantly and when Autumn Neugent remarked to someone in the office that she overheard Mills say "wow", which she believed to be directed at another employee, she was asked by Nyzio to make a written complaint against Mills. Plaintiff's

[2] Amazingly, some of the silly criticisms, including that Mr. Mills was seen in exercise garb while returning from a bike ride at 7:30 a.m., became centerpieces of Plaintiff's claim for breach of contract. Grand Heritage now claims that Mills' termination was justified because he violated the dress code policy by entering and leaving the premises (where he lived) in exercise clothes!

Statement of Undisputed Facts #31. Mills of course was never questioned because it was decided he would be terminated before any actual investigation, such that it was, began.

Defendant disputes Plaintiff's allegations in the attached declaration. Moreover, to the extent that Mr. Mills has admitted making certain comments attributed to him[3], the context is key. In essence, Mills has been terminated because Grand Heritage allegedly concluded, without ever interviewing Mills or even advising him of the nature of the complaint against him, that he had violated its sexual harassment policies and "federal and state anti-discrimination laws." The same is untrue and, at a minimum, presents a question of fact.

In order to establish a violation of federal and state anti-discrimination laws, on which the Grand Heritage policy is based, it must be demonstrated as to the person harassed, that:

(a) He or she belongs to a protected group;

(b) He or she was subjected to unwelcome sexual harassment;

(c) That harassment was based on sex;

(d) That harassment affected a term, condition or privilege of employment; and

In order to demonstrate hostile work environment sexual harassment (as alleged by the Plaintiff), it must be sufficiently severe or pervasive to alter the conditions of the

[3] Mr. Mills admitted that he playfully told three young employees (one female and two males) who were "goofing off" and teasing one another during a brochure-stuffing project, "don't make me spank you." Mills depo at p.182. And, although Nyzio contends that Mills made a comment about a guest having sex, in fact it is undisputed as to what actually occurred. A guest who had berated Nyzio and asked for her supervisor had launched into a telephonic diatribe. Mills, unbeknownst to Nyzio, put the phone on mute and blurted out words to the effect that he should "go sleep with your wife". Nyzio was stunned until Mills revealed that the mute button was on, at which point she laughed so hard she had to leave the room. Mills depo. at pp. 162-163.

employment and create an abusive working environment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed2d 49 (1986).

As the United States Supreme Court pointed out in *Farragher v. Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), "simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to changes in the 'terms and conditions of employment.'" *Farragher* at 188 S.Ct. 2283. The purpose of civil rights law is not to impose a "general civility code", and courts must filter out "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender related jokes, and occasional teasing." *Id. See, e.g., Hartsell v. Duplex Products, Inc.,* 213 F.3d 766, 772-773 (4th Cir. 1997) (no Title VII violation despite numerous employee's repeated offensive and derogatory remarks regarding the Plaintiff and women in general) *and Hopkins v. Baltimore Gas & Electric Co.,* 77 F.3d 145, 151 (4th Cir. 1996) (bumping into employee, positioning magnifying glass over employee's crotch, kissing the employee, staring at the employee and making inappropriate sexual comments for a seven year period was not sufficiently severe or pervasive to create an objectively hostile or abusive work environment).

Plaintiff has made the mistake of overreaching. Instead of simply advising the Defendant that he did not fit into the Grand Heritage culture of that their styles were not aligned and negotiate an exit plan, Plaintiff terminated the Defendant without notice or an opportunity to be heard. He was sued for breach of covenant of good faith and fair dealing for failing to volunteer that he had received two employee warnings during his decades in the hotel business. He was charged with violating state and federal laws in addition to a dress code policy which doesn't even apply to him (see Response to Plaintiff's Statement

of Undisputed Facts, par. 18). Worse, Plaintiff seems to rely on the claim that he was not respected by his staff to support its claim that Mills was fired for his continued failure to perform his duties. Obviously, when the top executives of Grand Heritage sends the massage that its Vice President does not have its confidence and support (by, for example, encouraging his executive assistant to report any criticisms behind his back), of course he will lose the confidence of his staff. Without any progressive discipline or demonstrated failure to achieve company goals, Plaintiff cannot demonstrate a "continued failure to perform" his duties.

## B. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

Both parties have asserted that the other breached its covenant of good faith and fair dealing to the other. Plaintiff's claim is baseless.

### 1. Plaintiff's Claim

There is an implied covenant of good faith and fair dealing between parties to a contract so that the contractual objectives may be achieved. *Ide Farm & Stable v. Cardi*; 110 R.I. 735, 737; 297 A.2d 643 (R.I. 1972), citing *Kerrigan* v. *City of Boston*, Mass., 278 N.E.2d 387 (1972); *Psaty & Fuhrman* v. *Housing Authority*, 76 R.I. 87, 68 A.2d 32 (1949); *Shaw* v. *E. I. DuPont de Nemours & Co.*, 126 Vt. 206, 226 A.2d 903 (1967). For example, the duty of good faith and fair dealing prevents a party from evading the spirit of the contract, willfully rendering imperfect performance, or interfering with the other party's performance. However, this requirement ***only applies after a binding contract is formed***. *Crellin Technologies, Inc.*, 18 F.3d at 10 (emphasis added).

Grand Heritage claims that Mills breached his duty by failing to disclose in the interview process that he had received two instances of discipline during his career. Even

if this were relevant, *Plaintiff could not recover on this claim in that Grand Heritage claims that Mills breached his duty before the contract was formed.*

Moreover, Mills has no duty to disclose instances of employee discipline received over a twenty year career in the hotel industry in the absence of Plaintiff's inquiry. Plaintiff hired a recruiter, conducted interviews with Mills, contacted numerous references and obtained a myriad of information regarding Mr. Mills background. He received glowing recommendations, as he should. His career has been marked by excellence and he received General Manager of the year twice while employed by the Peabody Group. Under his stewardship, the Peabody Hotel became one of the top 100 hotels in the country. Mills responded to each and every inquiry of Grand Heritage truthfully and candidly.

**2. The Defendant's Claim.**

Moreover, a separate claim for breach of covenant of good faith and fair dealing is alleged by the Defendant to encompass not only Mills' termination, but Plaintiffs' conduct leading up to and surrounding the termination.

Defendant contends that Grand Heritage never intended to honor its promises to Mills. From the outset, though Mills was given a two year contract, it is plain that Grand Heritage left itself the option of excusing its own performance. An internal memorandum from Michael Mason to John Cullen, GHH President, indicates that Victor Mills "might be a good solution for the next 6-8 months until we get more properties." Exhibit C. Moreover, though Grand Heritage promised Mr. Mills that he would be able to participate in the Phantom Equity Plan, the plan was never forthcoming. Though Plaintiff now advances a bogus claim that the equity plan was offered but that it was never represented to be existing at the time of the offer, that claim is put to rest by its own emails. After Mills

was interviewed for the Vice President position, Mr. Mason advised Mr. Cullen that, for Mills' position (VP-Ops), "the profit sharing plan is key." Exhibit D.

The email plainly demonstrates that the offer of profit-sharing was a key component to its offer to Mills and Mills own counterclaim establishes that Mills relied upon that offer, which was estimated would be worth two to three million dollars over a few years, in accepting employment. Mills has stated that he was repeatedly asked about the status of the Plan, only to be put off by Grand Heritage executives. Plaintiff, in failing to provide its promised benefit, breached its contract with Mills. Additionally, in failing to provide any detail, as promised, and by ignoring Mills insistence on plan participation, it breached its covenant of good faith and fair dealing

**C. THE FRAUDULENT MISREPRESENTATION CLAIM**

Defendant also contends that Plaintiff never intended to allow Mills to participate in the Phantom Equity Plan as promised. The tort of fraudulent misrepresentation or deceit is well established in Rhode Island law. To prove the elements of fraudulent misrepresentation, a plaintiff must demonstrate: 1) that the defendant made a false representation of material fact; 2) that the defendant intended thereby to deceive the plaintiff; 3) that the defendant intended that the plaintiff rely on the representation; 4) that the plaintiff did rely on the representation as true; and 5) that the plaintiff was injured as a result. *Banco Totta e Acores v. Fleet Nat'l Bank,* 768 F. Supp. 943, 947 (D.R.I. 1991) (*citing Cliftex Clothing Co. v. Di Santo*, 88 R.I. 338, 148 A.2d 273 (1959)). To establish fraud "the plaintiff must prove that the defendant 'made a false representation intending thereby to induce plaintiff to rely thereon' and that the plaintiff justifiably relied thereon . *Travers v. Spidell*, 682 A.2d 471, 472 -73 (R.I.1996) (quoting *Cliftex Clothing Co. v.*

*DiSanto*, 88 R.I. 338, 344, 148 A.2d 273, 275 (1959)). Defendant has established each element but the second, which is a question of fact.

While the Plaintiff is obviously not going to admit an intent to deceive, the same can be inferred by the conduct of the Plaintiff, evasiveness as to Mills' every inquiry about the plan during the course of his employment, the refusal to put anything in writing and the pattern of deceit by the Plaintiff, including the offer of a two year contract when it was contemplated at the outset that Mills would be a short term solution for the Biltmore. Defendant has the right to have a jury determine this issue.

**D. ABUSE OF PROCESS**

Defendant contends that within suit was not instituted in good faith, but rather to intimidate the Plaintiff, deter him from pursuing damages for breach of his employment contract, and preempt the Plaintiff's filing of a lawsuit in a different forum. Plaintiff's ill-considered Count II, in which it purports to recover from the Defendant its costs of his recruitment (for which there is no legal basis), fails to state an amount sought, probably because it does not meet the minimal jurisdictional requirements.

To prove an abuse of process claim, a plaintiff "must demonstrate that (1) the defendant instituted proceedings or process against the plaintiff and (2) the defendant used these proceedings for an ulterior or wrongful purpose that the proceedings were not designed to accomplish." *Butera v. Boucher*, 798 A.2d 340, 353 (R.I. 2002) (citing *Nagy v. McBurney*, 120 R.I. 925, 392 A.2d 365, 370 (R.I. 1978)); *see also Labonte v. Nat'l Grange Mut. Ins. Co.*, 810 A.2d 250, 254 (R.I. 2002) ("An 'action of abuse of process provides a remedy for a claim arising when a legal procedure, although set in motion in proper form, has been perverted to accomplish an ulterior or wrongful purpose for which it was not

designed.'") (*quoting Nagy v. McBurney*, 392 A.2d at 370). *See also Gallipeau v. Baer*, 2004 U.S. Dist. LEXIS 15848 (D.R.I. 2004). Here, if Defendant is able to demonstrate to a jury that Plaintiff had never intended to honor its two year commitment to Mills (as its internal correspondence suggests), that it knowingly breached its contract with Mills by manufacturing a "complaint" to justify its predetermined objectives[4] and that it subsequently filed a suit in a forum in which Mr. Mills did not reside in order to prevent, discourage and make it all but impossible for Mr. Mills to enforce his contract rights, a jury may decide that the Plaintiff instated the within Complaint for wrongful purposes.

**E. THE MICHAEL MASON DECLARATION**

As a final matter, Defendant suggests that the Declaration of Michael Mason, submitted in support of Plaintiff's Motion, be stricken. First, the declaration is replete with impermissible hearsay. Second, Mr. Mason, whom the Defendant has been attempting to depose since July of 2005, has been "unavailable". Despite being the 30(b)(6) designee for the Plaintiff (designated in March of '06), Mr. Mason would not appear in Providence for his deposition. See Defendant's Motion to Compel Deposition Testimony, previously filed.

It now seems that Mr. Mason has not been employed by the Plaintiff since early December, a fact that was only conveyed to the Defendant this very month of March. The Declaration was signed in November, apparently in anticipation of Mason's departure, as it was not filed until March 17. Plainly, the Plaintiff has been evading discovery and should not be allowed to yield any benefit from by relying upon Mason's untested assertions, while at the same time representing first that he was unavailable, then that he was not

---

[4] The decision to terminate Mills was made before an "investigation" had ever been conducted. See Declaration of Mills; Response to Statement of undisputed facts.

required to travel to Rhode Island and, now, that he may no longer be Grand Heritage's 30(b)(6) designee. Plaintiff has not acted in good faith in this matter and its conduct in this matter should not be rewarded.

WHEREFORE, Defendant requests that the within motion be denied.

Defendant,
VICTOR H. MILLS,

Melody A. Alger, Esquire #4585
Baluch, Gianfrancesco, Mathieu & Alger
155 South Main Street, Suite 101
Providence, RI 02903
Phone: 401-331-1434
Fax: 401-351-9653

**CERTIFICATION**

The undersigned hereby certifies that a copy of the within was mailed, postage pre-paid to:

Andrew B. Prescott, Esquire
Stacie Boeniger Collier
NIXON PEABODY LLP
One Citizens Plaza, 5th Floor
Providence, RI 02903 on this 31 day of ~~April~~ March, 2006