**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

GRAND HERITAGE HOTEL GROUP, LLC
Plaintiff,

Vs. C. A. NO.: 04-528T

VICTOR H. MILLS
Defendant.

**DECLARATION OF VICTOR MILLS**

1. My name is Victor Mills and I am a resident of the State of Alabama.

2. In May or June of 2004, I was recruited by an executive search firm named T.A. Davis to interview at a position with the Grand Heritage Hotel Group. After speaking with Grand Heritage's recruiter, I participated in two interviews.

3. I was asked for references and I gave a number of names of executives with whom I worked at my former places of employment, the Peabody Hotel Group and Tischman Hotels. I provided additional references from business associates connected with the hotel industry indirectly or directly that I had worked with over the years.

4. I subsequently learned that T.A. Davis, on behalf of Grand Heritage, conducted numerous interviews with both people whom I listed as references and people I had not listed.

5. When I was asked to provide references, John Cullen, President of the Grand Heritage Hotel Group, indicated that he knew some, if not all of my references.

6. Subsequently, I was offered a job serving as Vice-President, East, Grand Heritage Hotel Group and General Manager of the Biltmore Hotel.

7. I was given a job offer personally by John Cullen, who indicated that I would be making an annual salary of $150,000.00, a guaranteed bonus earned and paid quarterly, an opportunity to immediately participate in a Phantom Equity Plan with other vice presidents of the hotel group, relocation expenses, and the opportunity to live at the Biltmore temporarily while I searched for a home in Rhode Island.

8. At no time, was I ever asked, by any representative of Grand Heritage or T.A. Davis whether I had ever received any discipline, reprimand or verbal or written warning during the course of my employment history. I answered all questions truthfully.

9. In June of 2004, I was offered a position with Grand Heritage as Vice President, Operations-East.

10. Grand Heritage advised me that I would be needed immediately and that Grand Heritage intended to terminate the existing General Manager of the Providence Biltmore Hotel.

11. Based upon the representations of Grand Heritage, I made arrangements to relocate to Providence immediately.

12. Prior to relocating, I received a document that purported to reflect the terms of the employment agreement. There were a number of components of the offer which were not included. Several changes were made and initialed and both parties executed the agreement.

13. I inquired as to why details of the "Phantom Equity Plan" which had been offered to me were not outlined in the employment agreement. I was advised that Grand Heritage was in the process of drafting the language on the plan, which was represented to be available to several Grand Heritage executives.

14. Despite numerous requests and assurances by Grand Heritage's Vice President-People, I never received documentation of the Phantom Equity Plan as promised.

15. Like other executives and/or principals of Grand Heritage who stayed or resided at the Biltmore Hotel, I allowed to bill meals and other incidentals to expense reports. These expenses were submitted and approved by Grand Heritage on a monthly basis.

16. During the course of my employment, I was regularly in contact with Grand Heritage executives, including one Grand Heritage principal, Bashar Wali, who was a temporary resident of the Biltmore Hotel for most of my tenure as manager.

17. I was told that Mr. Wali was to be my mentor and someone who would help me adjust to the Grand Heritage corporate culture. John Cullen, president of Grand Heritage, advised me at the outset of my employment that the hotel was in need of deep cultural change both from physical assets in need of renovation as well as guest services standards which were well below his goal of Four Star Service. He indicated key managers would have to be terminated and that it would be necessary for me to let them go. He advised that turnaround was expected to take 1 ½ to 2 years.

18. Because my residency at the Biltmore was intended to be temporary, I made plans to purchase a home in the area and so advised Grand Heritage, through its agents, employees and executives. Although I had expected to stay in the Biltmore for no more than three months, finding a home proved difficult. I stayed in the Biltmore for just over five months with the acquiescence of Grand Heritage, which approved my monthly expenses incidental to my stay at the Biltmore.

19. I made unsuccessful offers on a number of homes before I found a suitable home in Barrington, Rhode Island and agreed to purchase same in November 2004. In accordance with the real estate purchase and sales agreement, I tendered a deposit of $40,000.00 on the residence.

20. On or about December 1, 2004, I was contacted by Michael Mason, Grand Heritage's Vice President-People regarding certain management issues. During this conversation, Mr. Mason discouraged me from closing on the purchase of the home and suggested that I instead "rent". I told him that I was scheduled to close on the property within ten (10) days.

21. Mr. Mason advised me that he would meet with me on or about Monday, December 6, 2004.

22. On December 6, 2004, Mason advised me that Grand Heritage had received a complaint of misconduct and that I would be suspended with pay in order for Grand Heritage to conduct an investigation. Several hours later, I was asked to appear at the office of Grand Heritage's legal counsel and I was forbidden from having counsel present.

23. At the meeting, Grand Heritage terminated me for alleged "misconduct", without advising me of the nature of the conduct alleged, the subject of the purported complaint, or the information that the "investigation" was alleged to have yielded.

24. At approximately 4:00 p.m. on December 6, 2004, I was told that my wife and I would have until noon on December 7, 2004 to vacate the Biltmore premises.

25. I was subsequently served with the within "Complaint for Declaratory Judgment and for Breach of Covenant of Good Faith and Fair Dealing."

26. At no time during the course of my employment with Grand Heritage was I ever warned, counseled or spoken to regarding any complaints of inappropriate behavior, sexual discrimination, or unwanted sexual advances toward any employee, male or female while employed at the Providence Biltmore. On the contrary, my mentor Mr. Wali more than once advised me that things were "going well."

27. At no time was I ever told that I made anyone uncomfortable while employed at the Providence Biltmore Hotel. If I ever greeted a person with a kiss on the cheek, clasp of the shoulder or shake of the hand, it was done in a non-threatening, non-sexual context. Any greeting exchanged with my staff was designed to convey warmth and approachability and I am unaware that I ever offended anyone. I never made a sexual advance towards any employee or agent of Grand Heritage during my entire tenure at the Biltmore.

28. At no time was I ever advised of the nature of the "complaint" that was lodged against me. I deny that I "leered" at Ms. Dornan, as reported by Ms. Neugent. If I came out of my office and said the word, wow aloud, I have no recollection of the comment or to what I was referring. However, I do deny making trips out of my office to stare at Ms. Dornan. To the extent that I am accused of making comments relative to the eating habits of female employees, I do admit that I more than once counseled the reservation office that they were not to eat while taking reservations and interacting with guests. I found this to be highly unprofessional and did advise the entire reservations department that they were to alter their eating habits at work..

29. At no time was I ever asked to provide an interview during the course of Mr. Mason's "investigation". Plaintiff's suggestion that violation of Grand Heritage's dress code policy serves as grounds for my termination is disingenuous and plainly pretextual. I dressed in a neat, elegant and professional manner during my work hours. I wore fitness garb to exercise, usually on bike rides. I had to enter and exit the premises to use my bicycle, which I stored at the Biltmore where I was residing during my tenure. I also dressed casually during weekends and non-work hours and again, entered and exited the hotel while so dressed. This was consistent with the habits of other Grand Heritage employees/executives who stayed at the Biltmore. Bashar Wali stayed at the Biltmore during much of my tenure and never advised that my manner of dress was in any way inappropriate. Michael Mason and John Cullen visited the site often and never found my dress to be inappropriate. In fact Michael Mason himself rarely, if ever, wore a tie.

30. Subsequent to my dismissal, Mr. Mason advised me that Grand Heritage had made the decision to terminate me prior to him coming to Rhode Island.

31. I constantly asked for feedback from my superiors, Bashi Wali and Mike Mason, both Grand Heritage executives, about my performance during the course of my employment. I did receive a memorandum dated September 30, 2004 from Mr. Mason identifying two areas of performance which required improvement. These specific items, entitled tenant relationships (identifying problems with a valet parking contractor) and Sales & Marketing (Exhibit A), were addressed to the satisfaction of Grand Heritage.

32. I routinely asked my executive assistant and Director of Human Resources, Lauren Nyzio, for feedback as to my performance while serving as General Manager of the Providence Biltmore Hotel. Specifically, I advised that one of her roles in her new position as Human Resource Manager, required her to keep me and the Biltmore Executive Committee apprised as to issues relative to employee morale and concerns and operational challenges or issues. She agreed to do so, but failed to keep me apprised even as she was covertly emailing and

calling my superiors about sundry and insignificant concerns, including second-guessing my decision to establish a casual Friday policy, my responses to her emails and whether or not I should be paid a quarterly bonus in accordance with my contract. I never received any negative feedback from Ms. Nyzio.

33. Grand Heritage, from the onset, encouraged employees to undermine me and sent the message, explicitly and impliedly, that I was not to be respected.

34. Grand Heritage tolerated misconduct among certain executives and managers who are still employed at Grand Heritage.

35. A top Grand Heritage executive, Bashar Wali, had a flirtatious relationship with a secretary, which even the Human Resource Director has acknowledged was inappropriate. This inappropriate relationship was well-known to many people in the Grand Heritage community, including the Director of Human Resources. To my knowledge, he was not disciplined.

36. The Director of Human Resources at Grand Heritage, Lauren Nyzio proudly announced to her staff that she and her husband were dressing as "a dildo" for Halloween. Ms. Nyzio flirted with other employees in emails and flirtatiously solicited a gift from a former employee in exchange for favorable employment action. To my knowledge, she has not been disciplined.

37. During my tenure at the Biltmore, I met goals, increased sales, re-organized the housekeeping department and put together a service excellence program designed to turn around the hotel's historically poor performance. I have participated as General Manager of four hotels where relocation on property combined with instructions to re-vamp the culture toward improving standards and financial returns was my priority. I have had high levels of success in all cases and found this hotel to be particularly cynical, negative and divisive. A long term plan, including the addition of new and positive key players, was being initiated. This placed some of these personnel at risk.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

GRAND HERITAGE HOTEL GROUP, LLC
Plaintiff,

Vs. C. A. NO.: 04-528T

VICTOR H. MILLS
Defendant.

**DECLARATION OF VICTOR MILLS**

1. My name is Victor Mills and I am a resident of the State of Alabama.

2. In May or June of 2004, I was recruited by an executive search firm named T.A. Davis to interview at a position with the Grand Heritage Hotel Group. After speaking with Grand Heritage's recruiter, I participated in two interviews.

3. I was asked for references and I gave a number of names of executives with whom I worked at my former places of employment, the Peabody Hotel Group and Tischman Hotels. I provided additional references from business associates connected with the hotel industry indirectly or directly that I had worked with over the years.

4. I subsequently learned that T.A. Davis, on behalf of Grand Heritage, conducted numerous interviews with both people whom I listed as references and people I had not listed.

5. When I was asked to provide references, John Cullen, President of the Grand Heritage Hotel Group, indicated that he knew some, if not all of my references.

6. Subsequently, I was offered a job serving as Vice-President, East, Grand Heritage Hotel Group and General Manager of the Biltmore Hotel.

7. I was given a job offer personally by John Cullen, who indicated that I would be making an annual salary of $150,000.00, a guaranteed bonus earned and paid quarterly, an opportunity to immediately participate in a Phantom Equity Plan with other vice presidents of the hotel group, relocation expenses, and the opportunity to live at the Biltmore temporarily while I searched for a home in Rhode Island.

8. At no time, was I ever asked, by any representative of Grand Heritage or T.A. Davis whether I had ever received any discipline, reprimand or verbal or written warning during the course of my employment history. I answered all questions truthfully.

9. In June of 2004, I was offered a position with Grand Heritage as Vice President, Operations-East.

10. Grand Heritage advised me that I would be needed immediately and that Grand Heritage intended to terminate the existing General Manager of the Providence Biltmore Hotel.

11. Based upon the representations of Grand Heritage, I made arrangements to relocate to Providence immediately.

12. Prior to relocating, I received a document that purported to reflect the terms of the employment agreement. There were a number of components of the offer which were not included. Several changes were made and initialed and both parties executed the agreement.

13. I inquired as to why details of the "Phantom Equity Plan" which had been offered to me were not outlined in the employment agreement. I was advised that Grand Heritage was in the process of drafting the language on the plan, which was represented to be available to several Grand Heritage executives.

14. Despite numerous requests and assurances by Grand Heritage's Vice President-People, I never received documentation of the Phantom Equity Plan as promised.

15. Like other executives and/or principals of Grand Heritage who stayed or resided at the Biltmore Hotel, I allowed to bill meals and other incidentals to expense reports. These expenses were submitted and approved by Grand Heritage on a monthly basis.

16. During the course of my employment, I was regularly in contact with Grand Heritage executives, including one Grand Heritage principal, Bashar Wali, who was a temporary resident of the Biltmore Hotel for most of my tenure as manager.

17. I was told that Mr. Wali was to be my mentor and someone who would help me adjust to the Grand Heritage corporate culture. John Cullen, president of Grand Heritage, advised me at the outset of my employment that the hotel was in need of deep cultural change both from physical assets in need of renovation as well as guest services standards which were well below his goal of Four Star Service. He indicated key managers would have to be terminated and that it would be necessary for me to let them go. He advised that turnaround was expected to take 1 ½ to 2 years.

18. Because my residency at the Biltmore was intended to be temporary, I made plans to purchase a home in the area and so advised Grand Heritage, through its agents, employees and executives. Although I had expected to stay in the Biltmore for no more than three months, finding a home proved difficult. I stayed in the Biltmore for just over five months with the acquiescence of Grand Heritage, which approved my monthly expenses incidental to my stay at the Biltmore.

19. I made unsuccessful offers on a number of homes before I found a suitable home in Barrington, Rhode Island and agreed to purchase same in November 2004. In accordance with the real estate purchase and sales agreement, I tendered a deposit of $40,000.00 on the residence.

20. On or about December 1, 2004, I was contacted by Michael Mason, Grand Heritage's Vice President-People regarding certain management issues. During this conversation, Mr. Mason discouraged me from closing on the purchase of the home and suggested that I instead "rent". I told him that I was scheduled to close on the property within ten (10) days.

21. Mr. Mason advised me that he would meet with me on or about Monday, December 6, 2004.

22. On December 6, 2004, Mason advised me that Grand Heritage had received a complaint of misconduct and that I would be suspended with pay in order for Grand Heritage to conduct an investigation. Several hours later, I was asked to appear at the office of Grand Heritage's legal counsel and I was forbidden from having counsel present.

23. At the meeting, Grand Heritage terminated me for alleged "misconduct", without advising me of the nature of the conduct alleged, the subject of the purported complaint, or the information that the "investigation" was alleged to have yielded.

24. At approximately 4:00 p.m. on December 6, 2004, I was told that my wife and I would have until noon on December 7, 2004 to vacate the Biltmore premises.

25. I was subsequently served with the within "Complaint for Declaratory Judgment and for Breach of Covenant of Good Faith and Fair Dealing."

26. At no time during the course of my employment with Grand Heritage was I ever warned, counseled or spoken to regarding any complaints of inappropriate behavior, sexual discrimination, or unwanted sexual advances toward any employee, male or female while employed at the Providence Biltmore. On the contrary, my mentor Mr. Wali more than once advised me that things were "going well."

27. At no time was I ever told that I made anyone uncomfortable while employed at the Providence Biltmore Hotel. If I ever greeted a person with a kiss on the cheek, clasp of the shoulder or shake of the hand, it was done in a non-threatening, non-sexual context. Any greeting exchanged with my staff was designed to convey warmth and approachability and I am unaware that I ever offended anyone. I never made a sexual advance towards any employee or agent of Grand Heritage during my entire tenure at the Biltmore.

28. At no time was I ever advised of the nature of the "complaint" that was lodged against me. I deny that I "leered" at Ms. Dornan, as reported by Ms. Neugent. If I came out of my office and said the word, wow aloud, I have no recollection of the comment or to what I was referring. However, I do deny making trips out of my office to stare at Ms. Dornan. To the extent that I am accused of making comments relative to the eating habits of female employees, I do admit that I more than once counseled the reservation office that they were not to eat while taking reservations and interacting with guests. I found this to be highly unprofessional and did advise the entire reservations department that they were to alter their eating habits at work..

29. At no time was I ever asked to provide an interview during the course of Mr. Mason's "investigation". Plaintiff's suggestion that violation of Grand Heritage's dress code policy serves as grounds for my termination is disingenuous and plainly pretextual. I dressed in a neat, elegant and professional manner during my work hours. I wore fitness garb to exercise, usually on bike rides. I had to enter and exit the premises to use my bicycle, which I stored at the Biltmore where I was residing during my tenure. I also dressed casually during weekends and non-work hours and again, entered and exited the hotel while so dressed. This was consistent with the habits of other Grand Heritage employees/executives who stayed at the Biltmore. Bashar Wali stayed at the Biltmore during much of my tenure and never advised that my manner of dress was in any way inappropriate. Michael Mason and John Cullen visited the site often and never found my dress to be inappropriate. In fact Michael Mason himself rarely, if ever, wore a tie.

30. Subsequent to my dismissal, Mr. Mason advised me that Grand Heritage had made the decision to terminate me prior to him coming to Rhode Island.

31. I constantly asked for feedback from my superiors, Bashi Wali and Mike Mason, both Grand Heritage executives, about my performance during the course of my employment. I did receive a memorandum dated September 30, 2004 from Mr. Mason identifying two areas of performance which required improvement. These specific items, entitled tenant relationships (identifying problems with a valet parking contractor) and Sales & Marketing (Exhibit A), were addressed to the satisfaction of Grand Heritage.

32. I routinely asked my executive assistant and Director of Human Resources, Lauren Nyzio, for feedback as to my performance while serving as General Manager of the Providence Biltmore Hotel. Specifically, I advised that one of her roles in her new position as Human Resource Manager, required her to keep me and the Biltmore Executive Committee apprised as to issues relative to employee morale and concerns and operational challenges or issues. She agreed to do so, but failed to keep me apprised even as she was covertly emailing and

calling my superiors about sundry and insignificant concerns, including second-guessing my decision to establish a casual Friday policy, my responses to her emails and whether or not I should be paid a quarterly bonus in accordance with my contract. I never received any negative feedback from Ms. Nyzio.

33. Grand Heritage, from the onset, encouraged employees to undermine me and sent the message, explicitly and impliedly, that I was not to be respected.

34. Grand Heritage tolerated misconduct among certain executives and managers who are still employed at Grand Heritage.

35. A top Grand Heritage executive, Bashar Wali, had a flirtatious relationship with a secretary, which even the Human Resource Director has acknowledged was inappropriate. This inappropriate relationship was well-known to many people in the Grand Heritage community, including the Director of Human Resources. To my knowledge, he was not disciplined.

36. The Director of Human Resources at Grand Heritage, Lauren Nyzio proudly announced to her staff that she and her husband were dressing as "a dildo" for Halloween. Ms. Nyzio flirted with other employees in emails and flirtatiously solicited a gift from a former employee in exchange for favorable employment action. To my knowledge, she has not been disciplined.

37. During my tenure at the Biltmore, I met goals, increased sales, re-organized the housekeeping department and put together a service excellence program designed to turn around the hotel's historically poor performance. I have participated as General Manager of four hotels where relocation on property combined with instructions to re-vamp the culture toward improving standards and financial returns was my priority. I have had high levels of success in all cases and found this hotel to be particularly cynical, negative and divisive. A long term plan, including the addition of new and positive key players, was being initiated. This placed some of these personnel at risk.

38. Grand Heritage, as it had done with the prior General Manager before me, terminated my employment summarily, without notice and in violation of my employment contract.

I hereby declare under pains and penalties of perjury that the foregoing is true and correct.

Executed on this 31st day of March, 2006 in Orlando, Florida.

3/31/06

Victor Mills